**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LIBERTARIAN PARTY OF CONNECTICUT | : | CIVIL ACTION NO. 3:15-cv-1851(JCH) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| DENISE MERRILL, SECRETARY OF THE STATE OF CONNECTICUT | : | |
| *Defendant* | : | JANUARY 15, 2016 |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF**

## I. INTRODUCTION

In this action, Plaintiff seeks to enjoin a provision of Connecticut's election statutes, and related statutes, that restrict who may lawfully witness the signatures on nominating petitions to attain ballot access for a general election to Connecticut residents. *See* Plaintiff's Verified Amended Complaint, Docket No. 15, "Compl.", pp. 8-9; Conn. Gen. Stat. § 9-453e. While the Plaintiff alleges that General Statute § 9-453e imposes a severe burden on its rights protected by the First Amendment, and unconstitutionally impinges upon its efforts to advance its political message to Connecticut voters, it provides little detail about how the operation of General Statutes § 9-453e has impeded its ability to attain ballot access for its candidates in Connecticut, or has interfered with its ability to communicate with the electorate, or will do so this election cycle.  Moreover, while Plaintiff relies upon United States Supreme Court and Circuit Court cases that establish that residency restrictions on petition circulating is subject to the highest degree of First Amendment scrutiny, it provides

little analysis or discussion of how Connecticut's overall electoral scheme, and its generous minor party provisions, warrant an extension of those cases to the unique circumstances of Connecticut's minor party electoral scheme.  Instead, Plaintiff relies upon its own assertions and cases analyzing the burdensomeness of other states' electoral schemes on candidates, parties and petition circulator plaintiffs, for its claim that § 9-453e, when considered in the context of an entire statutory scheme, imposes a burden that can be fairly characterized as "severe" and is therefore facially unconstitutional and cannot be constitutionally applied to it.

The facts proffered by Plaintiff demonstrate that it has enjoyed consistent success in achieving ballot access in Connecticut over many election cycles.  The is no evidence before this Court to suggest one way or another whether the Libertarian Party's political success to date is commensurate with the degree of public support it enjoys among the Connecticut electorate and/or reflects the number of enrolled Libertarian Party members who are willing to act as standard bearers for the Party by standing for election in Connecticut for Connecticut offices.  The facts alleged in Plaintiff's complaint indicate that, when it has acted diligently within a reasonable time period, the Libertarian Party has been capable of garnering the requisite number of elector signatures to satisfy Connecticut's 1% or 7500 signature requirement. Conn. Gen. Stat. § 9-453d

Given its history of actually attaining ballot access in Connecticut, the favorability of Connecticut's electoral scheme to minor parties generally and the absence of any contextual analysis for how Connecticut's statutes "severely" burden it, the Libertarian Party has not established at this time that it is entitled to the extraordinary relief of an injunction preventing the operation a provision of Connecticut's overall electoral scheme that facilitates orderly and fraud-free elections.  Accordingly, Plaintiff's motion should be denied by this Court.

## II.    FACTUAL BACKGROUND

### a. *Connecticut's Overall Electoral Scheme Affords Minor Parties Easy Access to the Ballot.*

Connecticut affords minor parties access to the ballot and other party-building opportunities that are unique, not constitutionally mandated, and among the most generous in the nation. Indeed, Connecticut's overall electoral scheme has for many years fostered the participation and growth of minor parties through liberal ballot access provisions and generous political association and endorsement statutes. In all local, legislative and statewide races, Connecticut maintains a uniquely open and flexible process promoting participation by minor party and independent candidates at all levels of state government. Any non-major party, like the Libertarian Party, can access the ballot by gathering signatures equal to the amount of 1% of actual voters in the previous election for that office (not 1% of all registered voters) or 7,500, whichever is less. Conn. Gen. Stat. § 9-453d. Moreover, minor party candidates who achieve 1% of the vote in the last election for a specific office are automatically eligible to be on the ballot for that office, without the need for further petitioning in the next election cycle. Conn. Gen. Stat. §§ 9-372(6), 9-379. Finally, Connecticut permits a generous seven month timeframe for signature-gathering. Conn. Gen. Stat. §§ 9-453b, 9-453i.[1] None of these Connecticut provisions is constitutionally required.

---

[1] In its brief, the Libertarian Party erroneously states that the deadline for submitting nominating petitions is September 7, 2016. (Pl. Mem. in Supp. Mot. For PI, Docket No. 17-2, "Pl. Mem." p. 4-5). Plaintiff is free to submit signed nominating petition pages to the appropriate town clerk any time after January 1, 2016 up to August 10, 2016. The town clerks are the election officials who actually verify the signatures of electors in their towns and then certify the number of valid signatures per page and, thereafter, send the pages to the Secretary for a final tabulation. This submission and verification process can be done at any time throughout the seven month petitioning period leading up to the August deadline so that Plaintiff can ascertain whether it has gathered the requisite number of valid signatures well before August or September. After the petitioning period closes on the 90th day preceding the general election, this year August 10,

In fact, the Second Circuit has recognized that Connecticut's "lenient" ballot access laws are well below the constitutional tolerance established by the Supreme Court. *LaRouche v. Kezer*, 990 F.2d 36, 39-40 (2d Cir. 1993) (Connecticut's petitioning requirement that minor party candidates garner signatures from 1% of the *prior vote total* well below threshold of 5% of *eligible voters* upheld by the Supreme Court).

Connecticut also fosters an inclusive electoral process by permitting minor parties to attain "minor party" status on a district-by-district basis, without demonstrating a requisite level of support statewide, which Connecticut could constitutionally demand. *American Party of Texas v. White*, 415 U.S. 767, 775 (1974).  By permitting district-by-district minor party status, Connecticut enables minor parties an enhanced ability to associate with voters at the ballot box, the most potent form of political association in our democracy, and, potentially, gradually build support across the state to attain statewide "major party" status. Moreover, Connecticut is also among only a handful of states that permit minor parties to build party name recognition, grow their electoral support and expand political influence through "fusion" voting or cross endorsements.  Conn. Gen. Stat. § 9-453t; *see also Timmons v. Twin*

---

2016, the Party then has approximately a month to submit a certificate of endorsement of a specific candidate to the Secretary for the placement of that name on the November ballot. Conn. Gen. Stat. § 9-452 (minor party nominations due to the Secretary on the sixty-second day prior to the November general election).   Any compressed timeframe experienced by the Party for ascertaining whether it has actually attained the necessary number of valid signatures for ballot access for its candidate, (Pl. Brief p. 5 "Libertarian Party has not learned whether its candidates would even appear on the ballot until mid-September"), is attributable its timing in submitting nominating petitions to local and state election officials and not exclusively to the operation of Connecticut's electoral scheme governing minor party candidates. *See also Reale v. Bysiewicz*, 298 Conn. 808, 813-15 (2010) (accurately describing Connecticut's petitioning process for non-major party candidates; *see also* Secretary of State Election Calendar for November 8, 2016 general election, available at *http://www.sots.ct.gov/sots/lib/sots/electionservices/calendars/2016_election/2016_election_cale ndar.pdf*.  (last viewed January 14, 2016).

*Cities Area New Party*, 520 U.S. 351, 357, n. 6, 117 S. Ct. 1364, 1369, 137 L. Ed. 2d 589 (1997) (noting states permitting fusion voting "has become the exception, not the rule" and 40 states prohibit it). This strategy, which the Supreme Court has held states are not constitutionally required to permit, *Timmons*, 520 U.S. at 363, is used by minor parties in Connecticut to nominate candidates also nominated by major parties, thereby garnering votes on their ballot line that otherwise go to that same candidate on the major party ballot line. *Republican Party of Connecticut v. Merrill*, 307 Conn. 470, 474, 55 A.3d 251, 254 (2012) (noting 26,308 votes for major party candidate received on the Working Families Party ballot line).

The Libertarian Party's history of success in attaining ballot access despite having only 1731 enrolled party members is evidence that Connecticut's electoral scheme imposes a minimal burden on minor parties to attain ballot access.  Notwithstanding its enrollment, under the current favorable electoral scheme, the Libertarian Party has been able to attain ballot access for its Presidential nominee in Connecticut in six of the last seven cycles. (Plaintiff's Verified Amended Complaint, "Compl.", ¶¶ 3, 5-6.) Indeed, the Party acknowledges that, at present, it has automatic ballot access for three different offices in Connecticut in 2016: the 20th State Senate District, the 2nd United States Congressional District, and the United States Senate. (Compl. ¶ 17).  The Libertarian Party is relieved of any burden to petition in these elections, which Connecticut could constitutionally require it to do, due to an electoral scheme that, as discussed above, allows a minor party to attain "minor party" status on an office-by-office basis in Connecticut.

Given the favorability of Connecticut's electoral scheme to fostering the growth of new or "non-major" political parties, like the Libertarian Party, and the Party's track record of

success in Connecticut, the facts, as alleged by the Party, do not satisfy the high burden required for the type of extraordinary relief it seeks.

## III.   STANDARD

A preliminary injunction is an "extraordinary remedy." *UBS Fin. Servs. V. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011), quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Sussman v. Crawford,* 488 F.3d 136, 139 (2d Cir.2007) (describing preliminary injunction as "extraordinary and drastic remedy"). A movant must show, beyond "irreparable" harm or injury, a "likelihood of [ultimate] success" where, as here, the preliminary injunction would affect "governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011). That "likelihood of success" standard is heightened further to a "clear" or "substantial" showing of such a likelihood of ultimate success where, as here, plaintiff seeks a mandatory preliminary injunction that would "alter, rather than maintain, the status quo." *Almontaser v. New York City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008). And that heightened standard of likelihood of ultimate success becomes even higher where, as here, the preliminary injunction "(1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citations omitted). Finally, the preliminary injunction movant must also show "that the public's interest weighs in favor of granting an injunction." *Red Earth LLC*, 657 F.3d 138, 143 (2d Cir. 2011).

Even if this Court deems the Libertarian Party's inability to use out-of-state circulators presently to be an "irreparable" injury, no preliminary injunction is appropriate

here because the Party based upon a verified complaint has not met the heightened standard-- a clear or substantial likelihood of ultimate success and proof that the public's interest requires the injunction. The decision to either grant or withhold equitable relief "rests in the sound discretion of the court." *Petrol. Expl., Inc. v. Pub. Serv. Comm'n of Ky.,* 304 U.S. 209, 218, 58 S.Ct. 834, 82 L.Ed. 1294 (1938).  Further, the Libertarian Party has not demonstrated that the injury is actual and imminent, and not remote or speculative, and that it cannot be remedied with monetary damages. *See Rodriguez ex. Rel. Rodriguez v. DeBuono,* 175 F.3d 227, 234 (2d Cir.1999).

## IV.   DISCUSSION

The United States Constitution provides that States may prescribe 'the Times, Places and Manner of holding Elections for Senators and Representatives,' U.S. Const. Art. I, § 4, cl. 1, and the Supreme Court therefore has recognized that States retain the power to regulate their own elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *see also, California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000); *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668, 192 L. Ed. 2d 704 (2015) (upholding state process for redistricting Congressional districts).  "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974).  A state is constitutionally authorized to "[enact] comprehensive and sometimes complex election codes, [e]ach provision of [which]. . ., whether it governs the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects – at least to some degree – the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983).  States also have an interest

in establishing thresholds for placing the name of a candidate on the ballot that "require[e] some preliminary showing of a significant modicum of support" before printing a candidate's name on the ballot, so as to "avoid[ ] confusion, deception, and even frustration of the democratic process at the general election." *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

### a. The Plaintiff Has Not Established High Standard For A Facial Challenge To General Statute § 9-453e

To establish its facial constitutional claim in Count I, the Libertarian Party must demonstrate that the challenged statute, in this case § 9-453e, cannot be applied constitutionally and that it lacks a plainly legitimate sweep. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 455, 457, 128 S. Ct. 1184, 1193, 170 L. Ed. 2d 151 (2008). Plaintiff cannot do so. General Statute § 9-453e clearly can be constitutionally applied to minor parties in Connecticut who do not seek to retain out of state circulators. Moreover, in *Lerman v. N.Y.C. Bd. of Elections*, 232 F.3d 135, 146, 148 (2d Cir. 2000), the Second Circuit declined to strike down a New York residency requirement for petition circulators.

Lastly, Plaintiff's assertions that there might be a more cost effective or efficient way for it to gather signatures and therefore gain ballot access, (Pl. Brief p. 4; Compl. ¶ 26), does not alone establish that General Statute § 9-453e establishes a severe burden on its rights for purposes of a facial constitutional challenge. Indeed, the Supreme Court and courts in this district have recognized that regulations that impose burdens on First Amendment political rights, even core political rights, and thereby deny voters and candidates of a preferred or more convenient mode for political association, do not violate the First Amendment. *See e.g., Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 2063, 119 L. Ed. 2d 245 (1992)

(upholding a state's prohibition on write-in voting); *ACORN v. Bysiewicz*, 413 F. Supp. 2d 119, 149 (D. Conn. 2005) (upholding Connecticut's seven-day voter registration deadline).

### b. *Plaintiff Has Not Demonstrated that General Statute § 9-453e "As Applied" To It Imposes A Severe Burden On Its First Amendment Rights*

Plaintiff also has not demonstrated that it is entitled to injunctive relief on its "as applied" challenge. The Defendant does not dispute that Plaintiff has set forth an accurate description of the legal framework that applies to First Amendment claims involving a severe burden on core political speech. (Pl. Br. pp. 6-7). Plaintiff correctly states the degree of judicial scrutiny given to an election statute increases with the severity of the burden that the challenged measure imposes upon a First Amendment right. *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 108 (2d Cir. 2008). People trying to persuade potential voters to sign a ballot access petition engage in "interactive communication concerning political change," *Meyer v. Grant*, 486 U.S. 414, 420 (1998), which is "core political speech." *Lerman v. N.Y.C. Bd. of Elections*, 232 F.3d 135, 148 (2d Cir. 2000) (declining to strike down New York's state residency requirement for petition circulators).

These statements of principle alone do not establish that Conn. Gen. Stat. § 9-453e operates in this case to severely burden this Plaintiff's access to the ballot and association with voters. Furthermore, Defendant does not dispute Plaintiff's contention that "it is crucial for the Party to begin gathering signatures as closely as possible to the January 1st start date, and for it to gather the signatures in the most efficient manner possible." (Pl. Br. p. 5). Notwithstanding that fact, cases in this Circuit and elsewhere suggest that the assessment of the severity of the burden of petitioning should be based upon discernable facts. *See e.g. Lerman,* 232 F.3d at 147 (noting a diminution of the number of potential circulators from the 170,000 registered members of the Independence Party statewide, to only 760 in the subject

district, rendering 99.5% of New York Independence Party members ineligible to circulate for their enrolled party); *Prestia v. O'Connor*, 178 F.3d 86, 89, n.3 (2d Cir. 1999) *cert. denied,* 528 U.S. 1025, 120 S.Ct. 539, 145 L.Ed.2d 418 (1999) (upholding a signature requirement, when viewed in light of the state's overall election scheme, did not preclude viable candidates who acted diligently from attaining ballot access); *see also Rockefeller v. Powers*, 78 F.3d 44, 46 (2d Cir.1996) (examining practical application of ballot access statute to Plaintiffs); *Buckley v. Am. Constitutional Law Found., Inc.,* 525 U.S. 182, 193, 119 S. Ct. 636, 643, 142 L. Ed. 2d 599 (1999) (examining facts adduced a trial and noting statistical evidence that operation of the statute reduced the potential pool of circulators by between 400,000-600,000).

In this case, the Libertarian Party has not adduced facts to provide a fuller picture of its claim of a severe burden. For example, it has not explained to the Court its process for gathering signatures in Connecticut under the current statutory system, whether it has in fact begun gathering signatures using its own members for 2016, its own candidates and other in-state circulators. Further, it has not identified the offices for which it has candidates willing and able to run for office under the Libertarian Party banner and for which it intends to put forward a candidate so the Court could better understand the burdensomeness of number of valid signatures the Party must gather. At present, there is little factual basis to assess the severity of the burden imposed by Conn. Gen. Stat. § 9-453e on the Libertarian Party. The absence of evidence is troubling given the extraordinary relief it Plaintiff seeks.

This Court should be particularly sensitive to Connecticut's compelling state interest of preventing fraud and confusion in the petitioning circulation process—a point Plaintiff concedes, Pl. Br. p. 7 citing *Lerman*, 232 F.3d at 149—because of the broader implication of

petitioning onto the ballot in Connecticut.   In Connecticut, the petitioning process is used to not only attain ballot access but also to become eligible to receive large public financing grants.  *Green Party of Connecticut v. Garfield*, 616 F.3d 213, 238 (2d Cir. 2010) (Upholding Connecticut's public financing program because that program's "statewide qualification criteria can hardly be said to harm the political opportunity of minor-party candidates…").

Plaintiff's assertion that the State has no history of difficulties involving out-of-state circulators or interest in restricting circulators to residents is inaccurate and ignores the State's broader interest in orderly administration of elections.  First, it is not fair to say there have been concerns related to or touching upon the employment of out-of-state petition circulators or out-of-state supervision of petition circulators in Connecticut.  In fact, the state agency that actually enforces Conn. Gen. Stat. § 9-453e, and related statutes, the State Elections Enforcement Commission, has investigated several matters involving allegations of out-of-state circulators and has encountered difficulty in locating and identifying individuals who left Connecticut and returned to other states. *See* Affidavit of William Smith, ¶ 7 and Exhibits C attached thereto.

Simply put, Plaintiff overreaches when it claims that "[f]urther, the defendant can present no evidence that Connecticut has been unable to prosecute any fraudulent circulators because they were not residents of the State." (Pl. Br. p. 8).  Moreover, Plaintiff fails to consider that Connecticut is not constitutionally required to permit a problem to develop in its election process or suffer through a long history of problems before enacting legislation to advance its compelling state interest in preventing disruption and fraud in its elections. *See e.g. Federal Election Comm'n v. National Right to Work Comm.*, 459 U.S. 197, 210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) ("Nor will we second-guess a legislative determination as

11

to the need for prophylactic measures where corruption is the evil feared"); *see also Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 391, 120 S. Ct. 897, 906, 145 L. Ed. 2d 886 (2000) ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised").

Second, combatting actual and intentional nominating petition fraud is not the only State interest advanced by the residency requirement for petition circulators. By simplistically describing the State interest as exclusively one of combatting and addressing actual fraud, Plaintiff ignores some practical administrative considerations that are broader than fraud. Plaintiff claims that, "Secretary Merrill cannot show that allowing non-residents of Connecticut to circulate nomination papers free from the supervision of an in-state resident would increase fraud, because doing so would require her to prove that non-residents are more likely to commit fraud than residents are." (Pl Br. p. 7). The challenged statute not only serves it an anti-fraud interest but also facilitates the administration of orderly elections.

By requiring nominating petitions be circulated by Connecticut residents—a greater percentage of whom could reasonably be presumed to be members affiliated with the non-major party; the Connecticut chapter of a national political party, or affiliated with the Connecticut candidate, than out-of-state circulators—the State may be better positioned to resolve pre-election questions and disputes involving candidates, election officials and electoral competitors in time to avoid any impact on the election calendar.

As Plaintiff acknowledges, the period between the deadline when non-major parties and petitioning candidates must submit their nominating petitions in August and when the Secretary announces in September the candidate names on the November ballot is only

approximately one month. After the Secretary's decision is made to place a candidate's name on the ballot is announced in September, only two months remain before the general election and only one month before the ballot must be finalized and mailed out to members of the United States military who are overseas and absentee ballots made available at the offices of town clerks. It is not uncommon for litigation to ensue involving the placement of a name of a petitioning candidate on the ballot in Connecticut. *See e.g. Buckley v. Secretary of State,* Superior Court Docket FBT -CV13-6038400-S (2013)(minor party candidate challenge to Secretary's decision to not to place name on ballot); *Forsyth v. Merrill,* Superior Court Docket HHD-CV12-6033316-S (2012) (challenge to election officials rejection of nominating petitions). In many circumstances, Connecticut statutes permit <u>any elector</u> to challenge in state court the Secretary's decision to put a candidate on the ballot or her refusal to do so. *See e.g.* Conn. Gen. Stat. § § 9-323, 9-324, 9-325, 9-328, 9-329a. Both candidates and competitors almost invariably bring suit in the weeks leading up to the November elections each year seeking judicial relief to have their name placed on the ballot or objecting to the same.

When a case touches upon petition circulating and a potential witness cannot be readily located, it can impede the timely and accurate disposition of an election matter by a state court judge. Having large numbers of petition circulators come from other jurisdictions—most of whom would presumably leave Connecticut after their paid work in Connecticut concluded or the August deadline expired—could result in difficulties broader than just preventing intentional fraud. As a consequence, the unavailability of witnesses could not only impede post-election investigations of actual petitioning fraud, which take months or years to thoroughly investigate, but also impede pre-election adjudication of a

claim to ballot access. The residency requirement may also advance the Connecticut's interest in orderly election administration by ensuring that circulators have some familiarity with the geographic boundaries of the municipalities and districts to avoid the inefficiencies of high numbers of invalidated petition signatures and pre-election ballot access disputes in the first instance.

It is well settled that states are the natural architects and monitors of their own election processes and are imbued with broad discretion to regulate these processes. *Burdick v. Takushi*, 504 U.S. 428, 433-34, 112 S. Ct. 2059, 2063, 119 L. Ed. 2d 245 (1992); *California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000); *Nader v. Shaffer*, 417 F. Supp. 837, 850 (D. Conn.) (three judge court), *summarily aff'd,* 429 U.S. 989 (1976) (quoting *Tansley v. Grasso,* 315 F. Supp. 513, 519 (D. Conn. 1970) (three judge court). This Court's deference to Connecticut's control of its own election processes serves not only federalism principles but also the real world consideration that election officials must balance a number of competing interests of conducting orderly and transparent elections and access to the ballot for non-major party and petitioning candidates is only one important consideration. While the fact that a petition circulator is an in-state resident does not guarantee that the Secretary will be able to achieve the undisputedly compelling state interests of orderly and fraud-free elections seamlessly, it can further that interest, and Plaintiff has not established that the residency requirement actually severely burdens it or its candidates.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion for a temporary restraining order and preliminary injunction enjoining the application of Conn. Gen. Stat. § 9-453e, and related statutes, should be denied.

>                             Respectfully Submitted,
>
>                             DEFENDANT
>
>                             DENISE MERRILL
>
>                             GEORGE JEPSEN
>                             ATTORNEY GENERAL
>
> BY:    /s/ *Maura Murphy Osborne*_____
>                             Maura Murphy Osborne
>                             Assistant Attorney General
>                             Federal Bar No. ct19987
>                             55 Elm Street
>                             P.O. Box 120
>                             Hartford, CT  06141-0120
>                             Tel: (860) 808-5020
>                             Fax: (860) 808-5347
>                             Maura.MurphyOsborne@ct.gov

## **CERTIFICATION**

I hereby certify that on January 15, 2016, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

>                             /s/ *Maura Murphy Osborne*
>                             Maura Murphy Osborne
>                             Assistant Attorney General